UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 3:23-CR-00009 |
| | ) | |
| ELLIOTT ATWELL, | ) | |
| | ) | |
| Defendant. | ) | |

### SENTENCING MEMORANDUM ON BEHALF OF ELLIOTT ATWELL

Mr. Elliott Atwell, through his attorney, hereby submits the following sentencing memorandum.

### INTRODUCTION

"I'd wanted to be honest with my parents about who I was. That I was gay. I'd played the scene out in my head so many times. I knew they wouldn't like it, but I knew they loved me…I wanted to love the real me. My mother saw the [sexually explicit messages with other adult men] and…she cried…I had to tell them the truth. I did. My mom said very clearly, almost calmly, that she prayed to God that he would give her cancer and kill her. My father agreed. He said he needed to take a walk but might go out to his work shed in the back and shoot himself in the head. He said he wished I was dead. They said I was disgusting—That I'd ruined my life and theirs—then they were quiet. We all were. And then they left…I was alone".

**--Elliott Atwell, in his own words.**[1]

The hardest question to answer at any criminal sentencing is: "Why did the defendant engage in the conduct that landed him before the Court?" Very often, the question gets overlooked. Courts, and even litigants, may feel like it is irrelevant,

---

[1] *See also* Presentence Report (PSR) at ¶ 62.

particularly in a case with a victim. However, the answer to "why" is about more than just past actions. It matters to the Court's assessment of the defendant, i.e. the ongoing threat to the public, need for deterrence, and the need to incapacitate a person for a longer period. In other words, if the Court can understand why a defendant did a thing, it can perhaps better assess whether there is some hope that the defendant can change such that they will not do that thing again.

Mr. Atwell's issues with his sexual identity were documented well before the indictment in this case; in fact, it was considered during his prior sentencing for dispensing prescription drugs without a prescription. *See* PSR at ¶ 55. Prior to the indictment in this case, Mr. Atwell was undergoing psychotherapy for Major Depressive Disorder, Binge Eating Disorder, and Anxiety Disorder. *See* Exhibit D (Under Seal)[2]. Many of these issues were based on his struggle to reconcile his sexual identity with the expectations placed on him by his family and faith community. His therapist assessed the following:



---

[2] This report was prepared for Mr. Atwell's sentencing on his prior conviction; however, it covers conduct that is relevant to this case and thus contains information that may be useful to the Court's individualized assessment.

*See* Exhibit D at 2-3. Moreover, he expressed the following to his therapist, regarding the current conduct:



Exhibit D at 2-3.

Crimes against children are particularly difficult to understand. Those who victimize children are easily written off as monsters—the worst that society has to offer. To a degree, even some Courts have recognized this.[4] Mr. Atwell recognizes

---

[3] This investigation eventually led to the current charges against Mr. Atwell, which were not known at the time of this report.

[4] *See United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010). ("Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense.

3

his actions are difficult to understand. He does not come before the Court with an excuse for his actions and he recognizes that *any* sentence within the plea agreement's sentencing provisions is less than he would have otherwise received had he gone to trial. He does ask this Court to try and see him for who he is and was: A man who struggled with his sexuality and the pressures placed upon him by the community to appear as a heterosexual Christian male. A fitness guru who was committed to the craft of improving the lives of his clients, personally and professionally. A committed friend and family member, who is loved by many. *See* Exhibit A (Character Letters in Support). And, yes, a flawed person who tainted all the good that he had the potential to do in the world by selfishly indulging in acts that caused damage to young people.

Mr. Atwell engaged in conduct that went beyond the pale. There is no sanitizing it. But there is more to this Court's consideration than just his flaws. This Court must conduct an individualized assessment including the offense conduct, Mr. Atwell's history, and the need to protect the public, among other things. Mr. Atwell contends that a sentence below the mid-point of the C-Plea range—which is 22 years—is sufficient but not greater than necessary to accomplish the goals of sentencing. Moreover, Mr. Atwell asks this Court to consider a sentence of 15 years' incarceration, based on the specific facts in this case and his personal history.

---

Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.")

4

## LEGAL ANALYSIS

**I. Section 3553(a) requires that this Court conduct an assessment to determine a sentence that is sufficient but not greater than necessary to accomplish the four purposes of sentencing.**

    A. <u>The four purposes of sentencing.</u>

18 U.S.C. § 3553(a) requires that a sentencing court "impose a sentence sufficient, but not greater than necessary" to accomplish the four purposes of sentencing:

1. *To punish* the defendant in light of "the seriousness of the offense," so as "to promote respect for the law" and "provide [a] just punishment";

2. *To deter* both the defendant and others from "criminal conduct";

3. *To incapacitate* the defendant and thus "protect the public from further crimes of the defendant"; and

4. *To rehabilitate* the defendant with "needed educational or vocational training, medical care, or other correctional treatment."

*United States v. Raby*, 575 F.3d 376, 380 (4th Cir. 2009) (emphasis in the original); *see also* 18 U.S.C. § 3553(a)(2); *United States v. Shortt,* 485 F.3d 243, 247–49 (4th Cir.2007).

    B. <u>The seven 3553(a) factors.</u>

To meet these four purposes, the Court must consider seven factors in imposing a sentence:

1. The nature and circumstances of the of the offense and the history and characteristics of the defendant;

2. The need for the sentencing imposed to A) reflect the seriousness of the offense, promote respect for the law, and to provide just

5

punishment for the offense; B) to afford adequate deterrence to criminal conduct; C) to protect the public from further crimes of the defendant; and; D) to provide the defendant with need education or vocational training, medical care, or other correctional treatment in the most effective manner;[5]

3. The kinds of sentences available;

4. The kinds of sentence and sentencing range established for A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines that are in effect at the time the defendant is sentenced; B) in the case of supervised release, the applicable guidelines or policy statements issued by the United States Sentencing Commission pursuant to 28 U.S.C. § 994(a)(3);

5. Any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. § 994(a)(2);

6. The need to avoid unwarranted sentence disparities among defendant with similar records who have been found guilty of similar conduct; and

7. The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

    C.    <u>The establishment of the Sentencing Guidelines and their applicability.</u>

Under the Sentencing Reform Act of 1984, the United States Sentencing Commission establishes Sentencing Guidelines based on two factors: 1) the seriousness of a defendant's offense and 2) his criminal history. *See Dillon v. United States*, 130 S. Ct. 2683 (2010). In combination, these two factors yield a range of potential sentencing for a district court to choose from in sentencing a particular defendant. *Hughes v. United States,* 138 S. Ct. 1765, 1772 (2018); *see also Molina-*

---

[5] These reflect the four purposes referred to in 3553(a).

6

*Martinez v. United States* , 136 S. Ct. 1338, 1342 (2016) ("The Sentencing Guidelines provide the framework for the tens of thousands of federal sentencing proceedings that occur each year.")  Though the Guidelines are only advisory post-*Booker*, a district court must consult them during sentencing, along with the 3553(a) factors. *See United States v. Booker,* 125 S.Ct. 738 (2005).  In imposing sentence, a district court must "treat the Guidelines as the starting point and initial benchmark." *Kimbrough v. United States*, 128 S. Ct. 558 (2007).  As the Guidelines are advisory, the sentencing court "may hear arguments … that the Guidelines sentence should not apply." *Rita v. United States*, 127 S. Ct. 2456 (2007).

    D.    <u>Sentencing procedure.</u>

The procedure that a district court must follow is now well established. The district court begins "by correctly calculating the applicable Guidelines range." *Gall v. United States,* 128 S. Ct. 586, 596 (2007); *see also Rita v. United States,* 551 U.S. 338, 351, 127 S. Ct. 2456, 168 L.Ed.2d 203 (2007); *United States v. Evans,* 526 F.3d 155, 160 (4th Cir.2008). But consideration of the Guidelines, which is but one of the seven factors listed in 18 U.S.C. § 3553(a), is only "the starting point and the initial benchmark." *Gall,* 128 S. Ct. at 596; *Evans,* 526 F.3d at 160–61. The court "then consider[s] what sentence is appropriate for the individual defendant" in light of the four purposes of sentencing and the seven factors for achieving those purposes, "explaining any variance from [the Guidelines range] with reference to the [§ 3553(a) factors]." *Nelson v. United States,* 129 S. Ct. 890, 891-92 (2009). In selecting a sentence, the district court has substantial discretion. Yet, in exercising its discretion, the court must give the parties "an opportunity to argue for whatever sentence they

7

deem appropriate," and thereafter "make an individualized assessment based on the facts presented." *Gall,* 128 S.Ct. at 597; *Evans,* 526 F.3d at 161; *See also United States v. Raby,* 575 F.3d 376, 380–81 (4th Cir. 2009).

## II.  "C-Pleas" are applicable in federal sentencing.

### A.  The definition of a C-Plea

Federal Rule of Criminal Procedure 11(c)(1)(C) (hereinafter "C-Plea") permits the defendant and the Government to "agree that a specific sentence or sentencing range is the appropriate disposition of the case," and "binds the court [to the agreed-upon sentence] once [it] accepts the plea agreement." *Hughes v. United States*, 138 S. Ct. 1765, 1768 (2018).  When the government and a defendant enter a C-Plea, the district court has three choices: "It "may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report." *Id*.  If the Court rejects the agreement, the defendant may withdraw his guilty plea.  *Id.*; *see also* Fed. R. Crim. P. 11(c)(5)(B).

### B.  The process for accepting a C-Plea.

In deciding whether to accept an agreement that includes a specific sentence, the district court must consider the Sentencing Guidelines. The court may not accept the agreement unless the court is satisfied that "(1) the agreed sentence is within the applicable guideline range; or (2)(A) the agreed sentence is outside the applicable guideline range for justifiable reasons; and (B) those reasons are set forth with specificity." United States Sentencing Commission, Guidelines Manual § 6B1.2(c). "[T]he decision whether to accept the agreement will often be deferred until the sentencing hearing," which means that "the decision whether to

8

accept the plea agreement will often be made at the same time that the defendant is sentenced." *United States v. Hyde,* 117 S. Ct. 1630 (1997).

## ARGUMENT

**I. Mr. Atwell argues that a sentence no greater than 222 months—the mid-point of the C-Plea range—is sufficient but not greater than necessary to achieve the goals of sentencing. Specifically, he asks this Court for a sentence of 180 months, based on an individualized assessment of his history and the circumstances of this case.**

    A.    <u>Child pornography generally and the nature and circumstances of Mr. Atwell's case.</u>

In child pornography cases generally, several courts have imposed below-Guidelines sentences, even in mine-run cases. *See United States v. Cruikshank*, 667 F.Supp.2d 697, 701 (SDWV 2009) ("Between July 1, 2009, and September 30, 2009, district courts imposed within-Guidelines sentences under §2G2.2 in only 44.6% of cases, compared to the overall average of 55.2%. Of the 662 cases that imposed sentences outside of the Guidelines range, 449 were below range."). While *Cruikshank* is more than a decade-old, recent statistics show that courts continue to routinely impose below guidelines sentences in child pornography cases. Recent statistics from 2023 show that 57.1% of child pornography defendants received a downward variance; their average sentence reduction was 38.8%. *See* Exhibit B (Sentencing Commission Quick Facts: Child Pornography Offenses for Fiscal Year 2023).[6]

---

[6] These statistics do not include production offenses.

9

It is fair to argue that enticing a young person to produce child pornography warrants harsher treatment than simple possession; however, that is already considered by the mandatory minimum of 15 years. The circumstances of these offenses show that Mr. Atwell's conduct—when viewed on the spectrum of child pornography *production* defendants—is on the lower end of the severity spectrum. First, the production victims were not prepubescent children.[7] Some were within months of being legal adults, at which point the conduct would not have been illegal at all.[8] Second, Mr. Atwell never directly produced the pornography. His role in the production stems from the fact that he requested the specific content and used his relationships and gifts to entice the teenagers to create the content. He is being appropriately punished for his conduct, but it is not the same as a person who actively videotapes a child without their knowledge, or through direct force or coercion.[9] Third, Mr. Atwell never attempted to have sex with any of the teenagers.[10] Fourth, Mr. Atwell never threatened any violence towards the teenagers in exchange for

---

[7] There were a few images of prepubescent pornography found in a larger batch of child pornography possessed by Mr. Atwell, which is applicable to Count 6. Count 6 is for possession only.

[8] For example, the sex tape created by MV1 was made after he had turned 18. There are prior nude photos of him that constitute child pornography. Another minor victim was within months of his 18th birthday when he sent Mr. Atwell sexual content.

[9] In this case, some of the victims self-produced sexual content without the knowledge of their female companions.

[10] MV1 visited Mr. Atwell for in-person training. There was no attempt to engage in sexual behavior.

10

sexual content; he gave them gifts, many of which were used to enhance their fitness careers.[11]

For these reasons, Mr. Atwell requests a downward variance that is consistent with the 57.1% of defendants nationwide who have received a variance in child pornography cases generally. In his case, a 38.8% reduction from the bottom of his guidelines yields a sentence of 180 months (15 years).[12] Mr. Atwell is requesting that this Court sentence him below the mid-point of the C-Plea range, and consider a sentence of 15 years exactly. This is a significant period of incarceration; enough to meet the four purposes of sentencing, but not greater than necessary.

>   B.  <u>Mr. Atwell has minimal criminal history, 3 years of post-high-school education, a consistent work history since college, and an established career where he contributed to the community as a fitness coach. He has never been to prison before.</u>

Mr. Atwell has a minimal criminal history. He has only 1 criminal history point and has never been incarcerated before this incident. He attended three years of college at Virginia Tech where he majored in Human Health, Nutrition, and Exercise (HNFE).[13] and has worked consistently throughout his entire adult life. His work history as reported in ¶¶ 69-73 of the PSR is laid out below:

---

[11] In this case, the enticement came in the form of pro bono training and gifts. They were no threats made in exchange for sexual content.

[12] 38.8% of 293 is approximately 113. A reduction of 113 months is 180 months exactly. A similar reduction from the top of the guidelines yields a sentence of 223 months.

[13] HNFE is described as a "Human Science-focused degree where students explore interdisciplinary content in human health, with a focus on nutrition, exercise, and physical activity. Students choose to major in Exercise and Health Sciences or Nutrition and Dietetics and take career specific courses in those majors." https://www.hnfe.vt.edu/undergraduate.html

11

- Atwell reported working as a line cook at Mount Ida Tasting Room and Taphouse in Scottsville, Virginia. He began working this job one week before his arrest on the instant offense, earning $22 an hour.

- From 2022 until the time of his arrest, the defendant reported self-employment through the Cooks Edge and as a personal trainer, earning $2,000 monthly from both businesses.

- The defendant worked at Associated Brokers Realty as a sales associate from 2014 to 2022. He reported earning $1,800 a month and left this business when the firm was sold.

- From 2013 to 2014, Atwell worked as a stock associate at UVA, earning $1,600 a month. He left this position to return to college at Virginia Tech.

- The defendant worked as a bouncer at Buffalo Wild Wings from 2009 to 2013, earning $800 a month. He left this job when he moved back home from college.

Moreover, Mr. Atwell's reputation as a fitness guru is warranted. While he made mistakes in his relationship with some of his clients, he has helped hundreds, including the victims in this case. For example, MV1 is a very famous fitness influencer who built a lucrative career based on his early training with Mr. Atwell.[14] His training began with Mr. Atwell on a pro bono basis. While it certainly veered into a negative direction, Mr. Atwell's role in MV1's career development should not be disregarded. While most of his clients did not achieve the notoriety of MV1, Mr. Atwell has helped hundreds of people who never had negative interactions with

---

[14] *See* Exhibit C (Under Seal).

12

him.[15] He has contributed to the community in significant ways and, in many respects, assisted young people in making their dreams come true.

Mr. Atwell's history demonstrates that a sentence that is beyond the mid-point of 222 months is more than necessary to accomplish the goals of sentencing. It also demonstrates why the Court should consider a low-end sentence of 180 months. Mr. Atwell has led a mostly exemplary life besides the crimes that he was charged with here. He has helped people in terms of their fitness goals, and their life and professional goals. Unfortunately, his decisions mean that everything that he has built will be tarnished. He will live with the shame of his actions, as will his family. The relationships and expertise that he spent a great deal of time building and cultivating on his own will no longer be useful to him. Moreover, he will lose his freedom for at least 15 years.

> C. <u>A sentence of 15 years is sufficient but not greater than necessary because it will act as a deterrent to Mr. Atwell and others, incapacitate him for a significant period of time, and presents just punishment, particularly for a non-contact sexual offense.</u>

A 15-year sentence will be a *deterrence*, particularly for someone who has never been to prison before, and whom various teachers, mentors, and friends describe as a person who is respectful and follows the rules. It also protects the public by *incapacitating* Mr. Atwell for a significant period. While 15 years is the low-end of the C-Plea range, it is the mandatory minimum, and it is significant. Many people

---

[15] "[Mr. Atwell] has helped hundreds of clients, the vast majority of which don't have a bad thing to say about him. He has paid his friends rents, taken care of his parents, and used his audience to help me get clients when I didn't have as big of an audience." *See* Exhibit A (Character Letters: Justn Gosselin).

13

with different charges, but much longer criminal records do not face this kind of sentence.

The most significant reason for giving Mr. Atwell a high-end sentence is *punishment*. While that is certainly a goal of sentencing, the Court is not required to give it more weight than the other goals, nor should it. A sentence below the middle of the C-Plea range is sufficient punishment and accounts for the seriousness of the offense. Moreover, while 15 years is the mandatory minimum, it is not a light sentence. To the degree that other defendants can be deterred, 15 years meets that objective, particularly where the typical child pornography defendant is a middle-aged male with minimal criminal history.[16] These are individuals who have typically never been to prison before; they are subject to one of the few federal crimes that disproportionately punishes an individual extremely harshly based solely on the nature of crime, as compared to the individual's criminal history and likelihood of recidivism. For some of these victims, a year—or even several months—is the difference between Mr. Atwell facing a felony with a 15-year minimum, and the conduct being lawful. If there is a deterrent effect to his punishment, it is this: A person could live an exemplary life with no criminal history yet face a Life sentence for the one area where they have shown a weakness—soliciting sexual content from

---

[16] The typical child pornography defendant in 2023 is a white male, averaging 41 years old, with a Criminal History Category of I. *See Exhibit B*.

14

minors. They face the most severe penalties allowable, regardless of whether they have ever physically touched—or even attempted to touch—a minor.[17]

**II.   An individualized assessment of Mr. Atwell's case supports a sentence below the mid-point of the C-Plea range, which is sufficient but not greater than necessary to accomplish the goals of sentencing.**

With respect to sentencing: "Good process often promotes good outcomes." *United States v. Friend*, 2 F.4th 369, 382 (4th Cir. 2021). There are always variations in sentencing, which is a "quintessentially fact-specific and multifaceted exercise." *Id.* Mr. Atwell is not asking this Court for 15 years merely because other courts have given below guidelines sentences. He is also not asking for this sentence simply because it is the lowest sentence he can request under the law. This Court should consider 15 years as sufficient based on the individualized assessment of this case. Consider the following factual recap:

- Mr. Atwell's guidelines range is 293-365 months imprisonment.

- Mr. Atwell's mandatory minimum is 180 months imprisonment.

- Mr. Atwell has a single criminal history point.

- Mr. Atwell never attempted to physically assault or engage in sex with any of the victims.

- The enticement victims were teenagers—some were within months of turning 18. None of the enticement victims were prepubescent minors.

---

[17] The PSR shows that if Mr. Atwell had gone to trial and lost, his sentencing guideline would be Life. This is even though there is no evidence that he ever attempted sexual contact with a minor.

15

- The sexual content was self-produced by the male victims. Mr. Atwell did not directly produce any child pornography, and some of the males videotaped their female companions without their knowledge, so that the males could continue to receive gifts from Mr. Atwell.

- The enticement of minors ended after 2020—more than 3 years before indictment.

- Mr. Atwell has completed three years of college and has an exemplary work history, starting while he was in college and showing no significant gaps in employment.

- Mr. Atwell has served many fitness clients without any improper sexual requests.

- Mr. Atwell has never been to prison before.

This recap covers the full sentencing process, from the consideration of the guidelines to the individual circumstances of Mr. Atwell's case. An individualized assessment of Mr. Atwell supports a downward variance sentence that falls below the mid-point of the C-Plea range. Moreover, a 15-year sentence warrants this Court's consideration based on the 3553(a) factors.

## CONCLUSION

Mr. Atwell will continue to deal with his issues surrounding his sexual identity and has made great strides in that regard. It stands to reason that as he continues to improve in this regard, the threat that he poses to the public will significantly decrease to the point that it is non-existent. A sentence of 15 years is sufficient for

him to engage in any treatment that is necessary to rectify his inner turmoil and get his life back on track.

 Mr. Atwell asks this Court for a sentence of 15 years' imprisonment.

        Respectfully submitted,

        /s/ Donald R. Pender
        Donald R. Pender, Esq.
        V.A. Bar No.: 97455
        N.C. Bar No.: 48004
        Assistant Federal Public Defender
        Office of the Federal Public Defender
        401 E. Market Street, Ste 106
        Charlottesville, VA 22902
        Ph. (434) 220-3392
        Fax (434) 220-3390
        Don_Pender@fd.org

## CERTIFICATE OF SERVICE

    I hereby certify that on January 2, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record.

                                    /s/ Donald R. Pender
                                    Assistant Federal Public Defender